FILED _____ LODGED
RECEIVED _____ COPY

APR 27 2026

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY VSB _____ DEPUTY

# UNITED STATES DISTRICT COURT DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Alan Amirault, | ) | Case No. CV-25-00555-TUC-RM |
| | ) | |
| vs. | ) | FIRST AMENDED COMPLAINT |
| | ) | |
| Lorrie Billie, *et al.*, | ) | (Non-Prisoner Filing) |
| Defendants. | ) | Trial by Jury Demanded |

Plaintiff Alan Amirault alleges:

## I. JURISDICTION AND VENUE

1. This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.
2. This Court has jurisdiction under 28 U.S.C. § 1331.
3. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims. 4. Venue is proper in this District because the events giving rise to these claims occurred in Cochise County, Arizona.

## II. ADMINISTRATIVE EXHAUSTION

5. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission.
6. Plaintiff received a Notice of Right to Sue and files this action within the time permitted by law.

## III. PARTIES

7. Plaintiff Alan Amirault is a resident of Arizona.
8. Defendant Disabled American Veterans San Pedro Valley Chapter 26 operated a thrift store in Benson, Arizona open to the public.
9. Defendant Disabled American Veterans Department of Arizona exercised oversight and control over chapter operations.
10. Defendant Disabled American Veterans is the broader parent organization associated with the chapter and department entities.

11. Defendant John Ingraham (Commander) acted in a supervisory and decision-making role concerning Plaintiff's participation at the store.

12. Defendant Lorrie Billie (Proper spelling) acted in a supervisory role concerning daily store operations and Plaintiff's duties.

## IV. FACTUAL ALLEGATIONS

13. Plaintiff is a person with disabilities, including agoraphobia, anxiety, and cognitive limitations affecting memory, concentration, and multitasking.

14. Plaintiff has experienced significant difficulty being in public, leaving home, interacting with others, and trusting unfamiliar environments.

15. Despite these limitations, Plaintiff made substantial efforts to leave home and participate at the DAV thrift store in order to contribute, function productively, and rebuild trust in community settings.

16. Plaintiff regularly assisted with store operations over an extended period.

17. Plaintiff performed ongoing operational duties including operating the register, handling money, organizing currency, opening or closing functions, assisting customers, and covering shifts.

18. Plaintiff relied on longstanding work habits developed through many years in the restaurant industry, including routine end-of-shift money counting and organization practices, to compensate for memory difficulties and maintain performance.

19. Plaintiff had approximately twenty-five years of restaurant and management experience involving cash handling, customer service, and operational responsibility.

20. Defendants permitted Plaintiff to perform core store functions and relied upon his assistance.

21. Plaintiff was placed on register duties in part because Defendants observed Plaintiff's physical limitations, which became noticeably worse over time, and register work was more manageable than heavier physical tasks.

22. Defendant Lorrie Billie previously praised Plaintiff's speed and efficiency in completing closing-related tasks.

23. Defendants were aware of Plaintiff's limitations.

24. Irene Baq acknowledged Plaintiff's limitations and stated on multiple occasions that she understood Plaintiff "couldn't multi-task."

25. Defendants nevertheless provided inconsistent instructions and conflicting expectations.

26. Plaintiff's confusion resulting from those inconsistencies was treated as misconduct rather than as a known limitation requiring reasonable modification of practices or clearer direction.

27. Defendants did not reasonably modify practices despite knowledge of Plaintiff's limitations.

28. Approximately one year or more before Plaintiff's removal, Irene Baq verbally counseled Plaintiff regarding certain cash-handling practices and stated they were inconsistent with store policy. Plaintiff was never shown any written policy.

29. After that conversation, Plaintiff brought the matter to Lorrie Billie. Lorrie Billie instructed Plaintiff to perform the task her preferred way when working with her and to do it the way Irene Baq wanted when Irene was present.

30. As a result, Plaintiff was given differing supervisory instructions regarding the same conduct.

31. No written warning, formal reprimand, suspension, or other discipline was ever imposed regarding those practices.

32. No further issue was raised for more than a year until the final two Saturdays before Plaintiff's removal, when Irene Baq again referenced the issue as a "CYA" concern, meaning "cover your ass."

33. During that same period, Irene Baq stated that she believed Plaintiff was being "set up."

34. On a Saturday in March 2025, while Plaintiff was working a shift that included Irene Baq, Plaintiff discovered money missing from his wallet.

35. At the end of his shift, Plaintiff reported the missing money and requested an investigation.

36. Plaintiff made that report in good faith and sought only that the matter be looked into.

37. On the following day, a Sunday at approximately 4:00 p.m., Plaintiff was called and directed to come to the DAV thrift store.

38. Upon arrival, Plaintiff observed John Ingraham and Irene Baq inside the store.

39. Plaintiff was asked to come into the office and sit down.

40. Irene Baq told Plaintiff, "we don't want someone who would leave their wallet out in control of the store."

41. Plaintiff was asked to return his key.

42. John Ingraham told Plaintiff he "wasn't getting [his] money back."

43. Plaintiff responded that getting money back was not his objective and that he wanted an investigation.

44. John Ingraham responded that he "didn't want [Plaintiff's] personal business mixed with DAV business," and that if Plaintiff wanted an investigation, he "can leave and never come back."

45. Plaintiff stated words to the effect of, "So I'm being punished? I'm the victim."

46. Plaintiff stood up, turned toward the door, and stated words to the effect of, "I don't have to listen to this."

47. John Ingraham then yelled, "Hit the road!"

48. Plaintiff left the store.

49. After leaving, Plaintiff participated in a speakerphone call with Irene Baq, Plaintiff's sister, and Plaintiff's brother-in-law.

50. During the speakerphone call, Irene Baq stated that John Ingraham "made her" terminate Plaintiff and that it was time to make an "executive decision" because she was supposed to take over in May.

51. During that call, Irene Baq stated that John Ingraham had been "watching" Plaintiff on store surveillance cameras.

52. Irene Baq further stated that Plaintiff had been observed counting change, bundling one-dollar bills into stacks, and running reports in a manner suggesting improper conduct.

53. Plaintiff denies theft or dishonesty and states that any money handling he performed was part of routine operational duties and end-of-shift practices.

54. The conduct described by Irene Baq was consistent with Plaintiff's assigned responsibilities and longstanding work habits intended to improve closing efficiency.

55. During the speakerphone call, Irene Baq stated, "we could have taken you off register."

56. Irene Baq also told Plaintiff to "walk away with [his] head held high knowing [he] did nothing wrong."

57. During the post-removal speakerphone call, Irene Baq told Plaintiff that John Ingraham intended to contact law enforcement and accuse Plaintiff of theft if Plaintiff retaliated or took action against Defendants.

58. Prior to Irene Baq making those statements during that call, Plaintiff had no knowledge of any such alleged intention by John Ingraham.

59. Irene Baq also stated that she believed Plaintiff may have been "set up."

60. No police report, internal report, or documented investigation existed at or near the time these statements were made.

61. Defendants' statements conveyed both an implication of criminal conduct and an acknowledgment of Plaintiff's innocence.

62. Lorrie Billie, who had direct knowledge of instructing Plaintiff to perform those practices and had previously praised Plaintiff's efficiency, was absent during the removal meeting and did not appear at the later hearing, leaving those prior instructions unaddressed.

63. Defendants' asserted reasons for removing Plaintiff were inconsistent with more than a year of prior reliance on Plaintiff's work, praise of his efficiency, and the absence of prior discipline.

64. Over time, Plaintiff had raised concerns regarding store operations, conflicting direction, handling of inventory, and situations where items, including higher-value merchandise, were removed or handled without clear documentation.

65. Defendants were aware of those concerns.

66. Plaintiff's removal occurred immediately after he requested an investigation into missing money.

67. Defendants later identified a different date for Plaintiff's removal. Plaintiff's account is tied to a Saturday shift worked with Irene Baq, followed by his call-in and removal the next day. This inconsistency calls into question the accuracy of Defendants' version of events.

68. Defendants later initiated legal action relying on communications they characterized as improper.

69. Following the events at issue, Plaintiff and Irene Baq engaged in intermittent cordial text communication for a period of time, including after Plaintiff informed her that legal filings had been initiated.

70. Plaintiff later sent occasional additional messages after responses became limited or ceased.

71. The initial continuation of cordial communication after the dispute and after notice of legal filings is inconsistent with any claim of immediate fear, emergency, or urgent need for protective action.

72. To the extent Plaintiff later sent emotional or strongly worded messages, those communications occurred during a period of heightened anxiety, sleep disruption, emotional distress, and worsening mental-health symptoms following Plaintiff's abrupt removal, the accusations described above, and Plaintiff's preexisting mental-health limitations.

73. Plaintiff's later messages reflected distress, frustration, and attempts to communicate or seek clarity rather than unlawful threats or malicious intent.

74. The delay between the alleged incident and later legal action was inconsistent with a genuine immediate safety concern.
75. The DAV thrift store is a place of public accommodation open to the public.
76. Plaintiff would return to the premises but is deterred from doing so because of Defendants' conduct and the stigma associated with the events described.
77. Plaintiff continues to suffer emotional distress, reputational harm, anxiety, sleep disturbance, and renewed avoidance of public settings.

## V. CLAIMS FOR RELIEF

## COUNT ONE - ADA DISCRIMINATION (TITLE III)

77. Plaintiff realleges the preceding paragraphs.
78. Plaintiff is disabled within the meaning of the ADA.
79. Defendants operated a place of public accommodation.
80. Defendants denied Plaintiff full and equal enjoyment of the store's services, privileges, and advantages.
81. Defendants failed to make reasonable modifications to practices despite knowledge of Plaintiff's limitations.
82. Plaintiff is deterred from returning.
83. Plaintiff seeks appropriate injunctive and declaratory relief.

## COUNT TWO - ADA RETALIATION / INTERFERENCE

84. Plaintiff realleges the preceding paragraphs.
85. Plaintiff disclosed disabilities and raised concerns related to his limitations and store operations.
86. Defendants were aware of Plaintiff's disability and related concerns.
87. Immediately after Plaintiff requested an investigation and after prior disclosures regarding his limitations, Defendants removed Plaintiff from the store.
88. Defendants, through Irene Baq, communicated threats of law-enforcement accusations if Plaintiff pursued action.
89. Such conduct constitutes intimidation, coercion, threats, or interference with rights protected by the ADA.
90. Defendants' conduct would deter a reasonable person from asserting protected rights.

## COUNT THREE - DEFAMATION

91. Plaintiff realleges the preceding paragraphs.
92. Defendants, through statements relayed to third parties, accused Plaintiff of theft-related conduct or dishonesty.
93. Those statements were false.
94. The statements were communicated to Plaintiff's sister and brother-in-law and otherwise harmed Plaintiff's reputation.

95. Plaintiff suffered damages.

## COUNT FOUR - FALSE LIGHT

96. Plaintiff realleges the preceding paragraphs.
97. Defendants portrayed Plaintiff as dishonest or engaged in theft-related misconduct.
98. That portrayal was false and highly offensive.
99. Plaintiff suffered harm as a result.

## COUNT FIVE - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

100. Plaintiff realleges the preceding paragraphs.
101. Defendants accused Plaintiff of theft, threatened legal consequences, abruptly removed him, and stigmatized him despite knowledge of his fragile mental condition.
102. Defendants' conduct was extreme and outrageous under the circumstances.
103. Plaintiff suffered severe emotional distress including increased anxiety, sleep disturbance, humiliation, renewed avoidance of public settings, and worsening distrust of others.

## COUNT SIX - ABUSE OF PROCESS

104. Plaintiff realleges the preceding paragraphs.
105. Defendants later used legal proceedings for an improper purpose including retaliation, intimidation, or to justify prior conduct.
106. Plaintiff suffered damages as a result.

## VI. DAMAGES

107. As a direct and proximate result of Defendants' conduct, Plaintiff suffered emotional distress, mental anguish, anxiety, sleep disturbance, humiliation, reputational injury, and interference with his efforts to manage disabling conditions and participate in public life.
108. Plaintiff also suffered loss of opportunity, loss of community participation, and renewed social withdrawal.
109. Plaintiff seeks compensatory damages in an amount to be proven at trial.
110. Plaintiff seeks punitive damages where permitted by law.
111. Plaintiff seeks costs and any further relief the Court deems just and proper.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment in his favor and against Defendants, awarding:

A. Declaratory relief;
B. Injunctive relief;
C. Compensatory damages;
D. Punitive damages where permitted by law;

E. Costs of suit; and

F. Such other relief as the Court deems just and proper.

## VIII. JURY DEMAND

112. Plaintiff demands trial by jury on all issues so triable.

DATED: 4/25/2026

Alan Amirault
Plaintiff, Pro Se
656 S Hwy 80 Unit 505
Benson, Az 85602